**In re NORTHTOWN REALTY
CO., L.P., Debtor.**

**Bankruptcy No. 197–20942–260.**

United States Bankruptcy Court,
E.D. New York.

Jan. 9, 1998.

Shearman & Sterling, by Arthur Norman Field, George Wade, Mary Warren, New York City, for Debtor.

Kronish, Lieb, Weiner & Hellman L.L.P., by Richard Lieb, Robert Feinstein, Jennifer Saffer, New York City, for Metropolitan Life Ins. Co.

Shaw, Licitra, Esernio & Schwartz, P.C. by John H. Hall, Jr., Garden City, NY, for Nassau Cty.

Rosen & Slome by Adam L. Rosen, Garden City, NY, for Joint Junior Noteholders and Subordinated Secured Noteholders Committee.

Office of U.S. Trustee by Alfred M. DiMino, Garden City, NY.

## MEMORANDUM DECISION

### CONRAD B. DUBERSTEIN, Chief Judge.

The Metropolitan Life Insurance Company, a secured creditor of debtor Northtown Realty Co., L.P., by the instant motion seeks the dismissal of debtor's recently filed chapter 11 case pursuant to 11 U.S.C.A. § 1112(b). Upon consideration of the arguments presented by all parties and for the reasons stated below, Metropolitan Life Insurance Company's motion to dismiss this chapter 11 case is granted.

## FACTS

The debtor Northtown Realty Co., L.P. is a limited partnership which owns and operates a multi-tenant retail shopping center located on Northern Boulevard in Manhasset, New York. The debtor's shopping complex (hereinafter referred to as "the Manhasset Center") currently contains retail stores and medical offices, although at one time several national retail chains such as "Bloomingdale's" and "Herman's Sporting Goods" had stores located in the Manhasset Center. The Zausner family, particularly Richard Zausner, control and manage both the debtor limited partnership as well as the Manhasset Center.

The instant dispute actually has its genesis not in the present chapter 11 case, but in the prior chapter 11 case filed by the debtor's predecessor ("Northtown I"). In February, 1992 Northtown I filed a chapter 11 case before this court. Northtown I's chapter 11 case was filed in large part to resolve issues the debtor had with its largest creditor, the Metropolitan Life Insurance Company ("MetLife"), as well as to resolve claims for real estate taxes made by the County of Nassau. In addition, there were numerous unsecured claimants involved in Northtown I who were represented by a committee of unsecured creditors as well as counsel. In September, 1993, approximately a year and a half after filing, Northtown I was able to effect the confirmation of a plan of reorganization.

The September, 1993 plan created the present debtor, Northtown Realty Co., L.P. (alternatively referred to as "Northtown II" or "the debtor") which, under the control of the Zausner family, assumed all of the obligations under the September, 1993 plan and which would own and manage the Manhasset Center. The confirmation of the September, 1993 plan also established various liens on the Manhasset Center property, creating a total indebtedness of approximately $25 million. In exchange for tax liens it claimed against the Manhasset Center, the September, 1993 plan provided that the County of Nassau would receive an interest-bearing note, secured by a first priority mortgage, in the amount of $2,421,984.61. As part of the plan MetLife received a second mortgage of approximately $18,428,741.98 for its claim of principal and interest due on the mortgage loan it made to Northtown I in 1989. The plan also provided for "junior" secured notes totaling $947,370.00 issued to a trustee for the benefit of all secured claimants other than MetLife and the County of Nassau. Finally, the plan issued "subordinated" secured notes in the amount of $3,209,190.00 to a trustee for the benefit of the general unsecured creditors of Northtown I.

Pursuant to the September, 1993 plan the debtor made payments on the various secured notes for several years while continuing to manage the Manhasset Center. However, commencing in late 1996 the debtor began to default on the various mortgage liens created under the September, 1993 plan. These included the default on its first mortgage to the County of Nassau, as well as on its current real estate tax obligations. In

March, 1997 the debtor defaulted on payments due MetLife under the plan and also stopped paying the junior and subordinated notes. The debtor contends that these defaults were caused by the bankruptcies of several prominent retail tenants, which caused the debtor to incur expenses for broker commissions and improvements as it pursued replacement tenants. MetLife disputes this however, and claims that management of the Manhasset Center by the Zausner family is to blame for the high number of tenant defaults and vacancies.

In an attempt to prevent a foreclosure by MetLife after its default, in the spring of 1997 the debtor developed and presented to MetLife a "plan" to procure additional tenants. This plan involved a moratorium on debt service while the debtor used available funds to develop rental prospects with the aid of a professional real estate broker. Apparently, however, MetLife eventually found the debtor's attempts to gain new tenants unsatisfactory and in June, 1997 MetLife commenced a foreclosure proceeding against the debtor in the Supreme Court of the State of New York, County of Nassau. On July 8, 1997 the state court appointed a receiver to manage the Manhasset Center during the pending foreclosure. As the foreclosure action continued in state court, the debtor again met with MetLife and sought approval of its proposed plan for new leases. MetLife apparently expressed concern regarding the feasibility of these purported leases. With the parties at a stalemate regarding whether the property should be sold as MetLife claimed, or whether the debtor should be given the chance to obtain new leases, the debtor sought the protection of chapter 11. On September 29, 1997 Northtown II's present chapter 11 petition was filed.

Immediately following the bankruptcy filing, MetLife filed the instant motion to dismiss Northtown II's chapter 11 petition. In seeking a dismissal, MetLife contends that because the September, 1993 plan was substantially consummated within the meaning of 11 U.S.C.A. § 1101(2)[1] it can not as a matter of law be modified by a subsequent plan.[2] According to MetLife, the purpose of Northtown II's instant case is solely to modify the obligations created under the September, 1993 plan, a purpose which it contends directly contradicts Bankruptcy Code § 1127(b)[3] and its provision against modification of a plan after substantial consummation. As all parties admit the September, 1993 plan was substantially consummated, MetLife argues that due to the prohibition contained in Code § 1127(b), the debtor is unable to effectuate any plan of reorganization as provided in Bankruptcy Code § 1112(b)(2)[4] and thus there is cause for the dismissal of the Northtown II petition. In addition, MetLife contends that the instant chapter 11 case should be dismissed as it was filed in bad faith according to the Second Circuit's recent decision in *C–TC 9th Avenue Partnership v. Norton Co. (In re C–TC 9th*

---

**1.** Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and will be hereinafter referred to as the "Bankruptcy Code" or "Code."

**2.** Section 1101(2) states,

(2) "substantial consummation" means -
(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan.
11 U.S.C.A. § 1101(2).

**3.** Section 1127(b) states,

The proponent of a plan or the reorganized debtor may modify such plan at any time before confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.
11 U.S.C.A. § 1127(b).

**4.** Section 1112(b)(2) states,

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or a bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including-
(2) inability to effectuate a plan.
11 U.S.C.A. § 1112(b)(2).

*Avenue Partnership* ), 113 F.3d 1304 (2d Cir. 1997).

The debtor counters that Northtown II has filed the instant petition in a good faith attempt to reorganize and to allow it time to gain new leases to replace the defaulted tenants. In response to MetLife's motion to dismiss, the debtor argues that MetLife is partly at fault for the high occupancy rate at the Manhasset Center because it has refused to allow the debtor to implement its rental plan for fear that the resale value of the property will decline if the Manhasset Center contains numerous tenants with long-term leases. The debtor contends that dismissal is detrimental to the junior and subordinate mortgage-holders, as they are possibly undersecured and their only realistic means of recovery is through a further reorganization. To support its argument that a reorganization based upon attracting new tenants is feasible, the debtor has presented to the court a term sheet from the "Equinox Fitness Club, Inc." which provides for the prospective long-term lease of a significant portion of the vacant space in the Manhasset Center. The debtor argues that if it is allowed the opportunity to actively seek tenants such as "Equinox" it will have sufficient rental income to fund a viable plan of reorganization which will provide a return to all creditors, and not just the first two mortgagees—MetLife and the County of Nassau. Thus, according to the debtor, MetLife's motion to dismiss is premature as the debtor has not had sufficient time to implement its leasing program.

Further, the debtor urges this court to reject MetLife's argument that Bankruptcy Code § 1127(b) forbids the modification of the September, 1993 plan by a subsequent plan of reorganization. First, the debtor argues that Northtown II is a different entity with a different bankruptcy estate than the previous debtor, Northtown I. The debtor cites to cases where it contends other courts have allowed second, or "serial," chapter 11 filings as an indication that there is no Bankruptcy Code prohibition against subsequent reorganizations. The debtor also argues that courts have allowed second chapter 11 cases where the debtor is able to demonstrate that

there have been unforeseen changes in circumstances since confirmation of the prior plan, thus necessitating the second reorganization. The debtor contends that Northtown II experienced such unforeseen changed circumstances in the form of a string of bankruptcies among its retail tenants, thus causing the Manhasset Center's occupancy rate to decline. Finally, the debtor argues that because it can propose a feasible reorganization plan if allowed time to gain new tenants, there is no cause to dismiss this chapter 11 case pursuant to Code § 1112(b) or the Second Circuit's decision in *C–TC 9th Avenue Partnership.*

As will be elaborated below, the court finds the debtor's arguments unpersuasive on several grounds. First, the debtor is unable to effectuate a plan of reorganization as it is barred by Bankruptcy Code § 1127(b)'s prohibition of modification of a plan after substantial consummation. Second, there have been no unforeseeable change in circumstances which would warrant allowing the debtor a second attempt at reorganization. Third, MetLife has amply demonstrated that under the factors enunciated in *C–TC 9th Avenue Partnership,* Northtown II's chapter 11 case was filed in bad faith. Therefore, MetLife's motion to dismiss this chapter 11 case is granted.

## DISCUSSION

### I. Bankruptcy Code § 1127(b)

MetLife first requests the dismissal of the Northtown II petition based upon the debtor's purported inability to propose a plan due to Code § 1127(b)'s prohibition on modification of a confirmed plan of reorganization after it has been substantially consummated. MetLife insists that in filing a second bankruptcy petition, the debtor seeks to contradict the obligations created as a result of the Northtown I confirmed plan. Citing to cases which it contends have specifically prohibited second reorganizations attempting to modify prior plans, MetLife argues that the debtor is unable to propose a confirmable plan and thus the case should be dismissed. The debtor counters this argument by contending that it is not attempting to contradict prior plan obligations, but instead intends to use

Northtown II as a means to provide a return to all creditors. In addition, the debtor contends that as the Bankruptcy Code provides no specific ban on subsequent or "serial" chapter 11 filings by corporate debtors, the Northtown II petition is not prohibited by law and the debtor should be allowed to propose a plan.

The debtor is correct in asserting that there is no *per se* or blanket prohibition on subsequent chapter 11 filings by corporate debtors. *See Fruehauf Corp. v. Jartran, Inc. (In re Jartran, Inc.),* 886 F.2d 859, 866–67 (7th Cir.1989); *In re Jamesway Corp. .,* 202 B.R. 697, 706 (Bankr.S.D.N.Y.1996) (noting that "serial chapter 11 filings are generally allowed"). However, while serial chapter 11 petitions may permissibly be filed, such petitions are still subject to all of the Bankruptcy Code's requirements. A serial chapter 11 case's failure to meet those requirements will trigger dismissal just as with any other chapter 11 case. Included in the Code's requirements for the maintenance of a chapter 11 case is the debtor's ability to effectuate a plan of reorganization, and the lack of such ability is cause for dismissal. 11 U.S.C. § 1112(b)(2). As one court has noted, "Bankruptcy courts are not required to retain Chapter 11 cases on their dockets which cannot achieve their *raison d'etre,* ie., confirmation of a reorganization plan." *In re 266 Washington Assocs.,* 141 B.R. 275, 288 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992). Thus the issue presented in this case is whether the debtor may propose a new plan to modify obligations which were assumed as part of the prior, confirmed and substantially consummated plan despite the proscription contained in § 1127(b). Upon examination of the statute and relevant case law, I conclude that while serial chapter 11 filings are not prohibited by the Bankruptcy Code, it is impermissible to use such filings to alter or modify obligations which were created and assumed through a substantially consummated prior plan of reorganization, except in the most extraordinary of circumstances as discussed below.

Several courts have been faced with similar serial chapter 11 filings in which the debtor sought to modify obligations created

in prior chapter 11 plans and have concluded that such modifications should not be allowed given the clear language of § 1127(b). *See e .g., In re Northampton Corp.,* 39 B.R. 955 (Bankr.E.D.Pa.), *aff'd,* 59 B.R. 963 (E.D.Pa. 1984); *In re AT of Maine, Inc.,* 56 B.R. 55 (Bankr.D.Me.1985); *In re Roxy Real Estate Co., Inc.,* 170 B.R. 571 (Bankr.E.D.Pa.1993); *In re Delray Assocs. Ltd. Partnership,* 212 B.R. 511 (Bankr.D.Md.1997). In addition, at least one circuit court has explicitly found that filing a serial chapter 11 for the purpose of contradicting the obligations created in the initial bankruptcy is cause for dismissal. *See Elmwood Dev. Co. v. General Elec. Pension Trust (In re Elmwood Dev. Co.),* 964 F.2d 508 (5th Cir.1992) (dismissing second chapter 11 petition after determination that debtor sought the "impermissible purpose" of obstructing the proceedings in its prior chapter 11). The basis for these decisions has been that the filing of a second chapter 11 whose purpose is to modify a prior plan is an act "so akin to modifying the previous plan within the meaning of § 1127(b)" that the new filing is viewed as a post-substantial consummation modification prohibited by the statute. *In re Northampton Corp.,* 39 B.R. at 956; *see also In re Delray Assocs. Ltd. Partnership,* 212 B.R. at 516.

Section 1127(b)'s prohibition of modification after substantial consummation provides both the debtor and creditors with finality as to confirmation orders. To allow the continual modification of substantially consummated plans, by a new chapter 11 case or otherwise, would create uncertainty among creditors. Why would a creditor consent to the treatment of its claim as part of a plan of reorganization if it thought that treatment could later be modified and its claim further impaired? *See Carter v. Peoples Bank and Trust Co. (In re BNW, Inc.),* 201 B.R. 838, 846 (Bankr.S.D.Ala.1996). To allow a debtor to continuously file plans of reorganization which modified the prior confirmed and consummated plan would render § 1127(b) meaningless. *See In re Northampton Corp.,* 37 B.R. 110, 112–113 (Bankr.E.D.Pa.1984) ("To accept such rationale would ... allow a debtor to continuously circumvent the provisions of a confirmed plan by filing chapter 11 petitions ad infinitum."); *see also In re*

*Jartran,* 886 F.2d at 868 (noting that the prohibition on modification after substantial consummation prevents "debtors from evading responsibilities under prior plans"). This surely could not have been Congress' intention.

■ Further, I conclude that it is impermissible for the court to use the broad discretionary powers provided in Bankruptcy Code § .105 [5] to allow this case to continue in the face of § 1127(b)'s proscription. The opponents of MetLife's motion have argued that if Northtown II is dismissed, the subordinate mortgagees may have no means of recovery as a foreclosure sale may not produce a sale price sufficient to pay their claims. However, this can not govern the court's decision in light of the language of § 1127(b) and the case law discussed. While the plight of the subordinate mortgagees is unfortunate, it is not unusual in bankruptcy as rarely if ever is it in the best interest of subordinate creditors to allow a superior mortgagee to enforce its rights by foreclosure. *See In re University Commons, L.P.,* 204 B.R. 80, 82–83 (Bankr.M.D.Fla.1996). The parties' present positions were negotiated in the prior reorganization, and the court may not use its equitable powers to assist them in contravention of specific Bankruptcy Code provisions.

■ However, it should be noted that I was initially reluctant to consider MetLife's motion to dismiss the Northtown II petition during the case's infancy. As I expressed to the parties when this motion initially appeared on my calendar, I wished to allow the debtor the opportunity to indicate whether it intended to file a plan in Northtown II which would modify the obligations assumed under Northtown I or if it instead intended to liquidate within chapter 11. However, based upon the submissions and the argument presented since that time, it has become apparent that the debtor does indeed intend to utilize Northtown II to modify or alter rights created in the Northtown I plan of reorganization. *See* Preliminary Outline of Debtor's Chapter 11 Plan of Reorganization (hereinafter "Debtor's Plan Outline"), dated December 3, 1997, at 2–3 (stating that the debtor intends to issue a new note to MetLife and to confirm its plan by cramdown if necessary, etc.). As previously stated, I have concluded that this is an impermissible purpose for a serial chapter 11 case, thus mandating dismissal of the Northtown II petition. The debtor has argued however, that second chapter 11 filings have been permitted despite the restrictions contained in § 1127(b). But, as will be discussed below, such chapter 11 filings have been permitted only in certain narrow circumstances not present in the instant case.

Courts have allowed serial chapter 11 filings for the purpose of conducting a liquidation of the debtor's assets after a reorganization has failed. *See In re Jartran,* 886 F.2d at 867. In *Jartran* the Seventh Circuit Court of Appeals determined that the debtor's second chapter 11 case was presented in good faith as it was filed for what the court decided was the permissible purpose of liquidation. *Id.* at 867–68. In so ruling, the Seventh Circuit reasoned that by pursuing liquidation through chapter 11, the debtor was not attempting to evade its responsibilities under the prior reorganization plan and was instead pursuing a goal "entirely distinct" from that of the original petition. *Id.* at 868–69. In contrast to the situation presented in *Jartran,* the debtor in Northtown II has specifically stated that it desires the opportunity to attempt a reorganization before it would consent to the Manhasset Center being sold. *See* Aff. of Richard Zausner (hereinafter "Zausner Aff."), dated Oct. 8, 1997, at 11 (stating that the debtor would consent to a sale of the property if its efforts to gain new tenants were not successful within six months of the filing date). As previously noted, the debtor has also specifically stated that it intends to "restructure" the

---

**5.** Section 105(a) states,

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C.A. § 105.

mortgages created as part of Northtown I. Such statements evidence a clear intent not to liquidate within the confines of chapter 11, but instead to attempt a further reorganization. Thus, the debtor does not fall within the exception where serial chapter 11 cases are permitted for the purpose of liquidation.

Certain courts have also permitted serial chapter 11 filings where the debtor has shown that unforeseeable changed circumstances have occurred since confirmation of the prior reorganization. But such serial chapter 11 cases have been permitted only in very unusual, almost extraordinary, factual situations. "Unanticipated changed circumstances" sufficient to justify a serial chapter 11 filing have been defined as "a legitimately varied and previously unknown factual scenario" which requires "a different plan to accomplish the goals of bankruptcy relief." *In re Elmwood Dev. Co.*, 964 F.2d at 511. Any purported change in circumstances must "justify the debtor's default under the first plan" while making "reorganization under a second plan likely." *In re Roxy Real Estate Co., Inc.*, 170 B.R. at 576. For example, one bankruptcy court permitted a serial chapter 11 filing after the debtor presented evidence that there had been a "significant change" in its market. *See Lincoln Nat'l Life Ins. Co. v. Bouy, Hall & Howard and Assocs. (In re Bouy, Hall & Howard and Assocs.)*, 208 B.R. 737, 745 (Bankr.S.D.Ga.1995). In that case the debtor's hotel business was damaged when a nearby airport which supplied much of the debtor's customer base changed terminals to one located further away from the debtor. *Id.* at 738–40. In addition, two airlines eliminated their service into the airport, further eroding the debtor's customer market. *Id.* Based upon this showing, the bankruptcy court denied a creditor's motion to dismiss the debtor's second chapter 11 filing and stated that such a serial filing would be permissible where "the facts of the second case are significantly distinguishable from the first so as not to offend traditional notions of res judicata." *Id.* at 743.

Changed circumstances justifying a second attempt at reorganization have also been found where the debtor's market is impacted by a change in the law, *see CFC 78 Partnership B v. Casa Loma Assocs. (In re Casa Loma Assocs.)*, 122 B.R. 814, 818 (Bankr. N.D.Ga.1991) (allowing second chapter 11 where debtor operated "adults-only" apartment complex and new federal law prohibited discrimination against children as tenants), or where the debtor has amassed a significant amount of new debt since the first reorganization. *See In re Garsal Realty, Inc.*, 98 B.R. 140, 150 (Bankr.N.D.N.Y.1989) (noting that debtor's second chapter 11 was not an attempt to modify the prior plan due to new debt which did not arise until after substantial consummation of prior plan). While it is clear from these decisions that unanticipated changed circumstances may justify a second chapter 11, it is equally clear that a change in general economic conditions alone is an insufficient basis for a second chapter 11. *See In re Bouy, Hall & Howard and Assocs.*, 208 B.R. at 745; *see also In re Roxy Real Estate Co., Inc.*, 170 B.R. at 576 (noting that a change in market conditions for rental properties is insufficient changed circumstances and citing *In re Casa Loma Assocs.*, 122 B.R. at 818).

In the instant case, the debtor argues that it has experienced the kind of unanticipated changed circumstances which have justified serial chapter 11 petitions. According to the debtor, after confirmation and consummation of the September, 1993 there was a decline in its occupancy rate due to a rash of retail bankruptcies among several of its tenants, thus causing them to default on their obligations to the Manhasset Center. Apparently the debtor contends that a "down-sizing" retail industry created a "down-sized" tenant base for the Manhasset Center. Further frustrating the debtor's efforts was MetLife's alleged categorical rejection of new leases in an apparent fear that new long-term leases would erode the marketability of the Manhasset Center should it be sold at foreclosure. The debtor contends that this combined to create unforeseen changed circumstances such that it was forced to seek to reorganize and modify the obligations under the September, 1993 plan.

Upon review of the authorities previously described, I find that unforeseen changed circumstances of the type described by those

courts which have permitted a second attempt at reorganization are not present in this case. As previously noted, courts have narrowly interpreted the concept of changed circumstances and have determined that a change in market conditions is itself insufficient. Tenant defaults of the type which the debtor alleges are present in this case are simply not the fundamental shift in business conditions contemplated by the decisions noted. Instead such changes in conditions are to be considered a "normal risk of doing business." *See Security Pacific Credit Corp. v. Savannah, Ltd. (In re Savannah, Ltd.),* 162 B.R. 912, 915 (Bankr.S.D.Ga.1993) (noting that if a normal risk of business justified subsequent reorganizations, "courts would be faced with never-ending Chapter 11 cases"). Indeed, as one court stated in a strikingly similar case,

> Thus, I do not consider a tenant's default to be an event which justifies in this instance yet another bankruptcy filing. To conclude otherwise would yield the counterintuitive position that this debtor could file successive chapter 11 cases so long as a new tenancy were likely, regardless of the terms of any prior agreements with the mortgagee and regardless of the terms of any confirmed plan in a prior case.

*In re Roxy Real Estate Co., Inc.,* 170 B.R. at 576. Therefore, the debtor has not shown that the Manhasset Center has undergone the unanticipated changed circumstances which might allow a second or serial chapter 11 reorganization in the face of the language in § 1127(b).

*II. Bankruptcy Code § 1112*

In addition to Bankruptcy Code § 1127(b)'s prohibition on post-consummation modification, the debtor's case must also be dismissed on the grounds that the debtor has no reasonable likelihood of reorganization and its chapter 11 case was filed in bad faith. *See C–TC 9th Avenue Partnership v. Norton Co. (In re C–TC 9th Avenue Partnership),* 113 F.3d 1304 (2d Cir.1997). In determining whether a chapter 11 case has been filed in bad faith, the court should carefully examine the facts and circumstances unique to that case. *Id.* at 1312. Any decision, such as a determination of bad

faith filing, which has the effect of denying the debtor access to bankruptcy relief before the proceeding is fully developed must not be lightly made. *See Carolin Corp. v. Miller,* 886 F.2d 693, 700 (4th Cir.1989). However, where the circumstances of a case mandate such extraordinary relief, the court must not be reluctant to order it. *See In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 756–57 (Bankr.S.D.N.Y.1997). The debtor in the instant case has presented little reliable evidence that it will realistically be able to effectuate a reorganization. This combined with the factors enunciated by the Second Circuit Court of Appeals in *C–TC 9th Avenue Partnership* mandates that this case be dismissed as having been filed in bad faith.

A filing may be found to be in bad faith where the debtor does not have a realistic possibility of reorganization. *See Y.J. Sons & Co., Inc. v. Anemone, Inc. (In re Y.J. Sons & Co., Inc.),* 212 B.R. 793, 802 (D.N.J. 1997). Bad faith may also be found where there is evidence of an intent to delay or frustrate the efforts of secured creditors to enforce their legitimate rights. *See 9281 Shore Road Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Road Owners Corp.),* 187 B.R. 837, 848 (E.D.N.Y.1995); *In re Spectee Group, Inc.,* 185 B.R. 146, 155 (Bankr.S.D.N.Y.1995). Finally, serial filings may also be a hallmark of bad faith which combined with other factors will justify dismissal. *See In re McCormick Road Assocs.,* 127 B.R. 410, 414 (N.D.Ill.1991); *In re Spectee Group, Inc.,* 185 B.R. at 156.

It is apparent that all of the indications of bad faith described above are present in the instant case. First, this is a serial chapter 11 filing which, as the court has already indicated, improperly has as its purpose the modification of obligations assumed as part of a prior confirmed and consummated plan. Second, the debtor's filing evidences an intent to delay or frustrate MetLife's foreclosure action. Although the debtor's petition was filed in late September, 1997 and MetLife had commenced its foreclosure action in late June, 1997, obviously the foreclosure action and the subsequent appointment of a receiver were strong moti-

vations for the debtor's seeking chapter 11 relief. Finally, it is equally apparent to this court that the debtor does not enjoy a reasonable possibility of reorganization further indicating that its petition was filed in bad faith. The debtor has stated that if allowed to pursue its reorganization plans, it intends to enter into a long-term lease with "Equinox Fitness Club, Inc." The debtor contends that upon consummation of this lease transaction a substantial amount of its vacant retail space would be filled. *See* Zausner Aff., at 9–10. The debtor also argues that it waited to file its chapter 11 until it could bring to the court what it characterizes as this "viable alternative to sale." *Id.* at 10. But upon examination, the purported lease with Equinox is anything but viable and is an insufficient basis upon which to retain this chapter 11.

In support of the Equinox lease the debtor provided a "term sheet" which purported to detail the transaction. However, no signed lease was ever presented so as of this date there is no *binding* agreement with Equinox. The term sheet contemplates that significant work must be performed by the debtor in order to provide Equinox with rentable space. The debtor has failed to provide the court with the specific means by which the debtor will be able to fund this work and still keep current on its expenses and taxes. Further, the debtor's preliminary outline of a plan of reorganization, submitted upon the court's request, states that no cash capital contributions are expected. *See* Debtor's Plan Outline, at 4. Yet the same outline also provides that the plan will be funded through rentals of retail space. *Id.* at 2–3. The question remaining is how will the debtor attract the new tenants and leases upon which it hopes to fund a plan if it contemplates no new funding, and when as of this moment it does not have sufficient funds to service its debt under the September, 1993 plan, much less pay new debt as well? The debtor's contention that it will fund a plan through new leases is also belied by the fact that it apparently had several prospective leases prepetition which never came into fruition. See Aff. of Robert J. Feinstein, Esq., dated December 3, 1997 (detailing prospective leases between the debtor and "Cablevi-

sion," "Sutton Place Gourmet Foods," "The Fitness Company" and "Marty's Shoe Outlet" which never materialized). Absent signed leases, solid financial projections and a clear source of funding, the debtor's optimism is insufficient to sustain this case in the face of MetLife's categorical opposition to any plan of reorganization which would alter or modify their claim. Therefore, the debtor has no reasonable likelihood of reorganization and this case must be dismissed as having been filed in bad faith. *See In re American Property Corp.,* 44 B.R. 180, 182 (Bankr. M.D.Fla.1984) (finding that bad faith is shown when the purpose of a chapter 11 is "to hold a single asset 'hostage' in order to speculate that such asset may increase in value" so as to allow investors' recovery at the creditor's risk).

This court's finding that Northtown II was filed in bad faith is also buttressed by the factors enunciated by the Second Circuit Court of Appeals in *C–TC 9th Avenue Partnership v. Norton Co. (In re C–TC 9th Avenue Partnership),* 113 F.3d 1304 (2d Cir. 1997). In *C–TC 9th Avenue Partnership* the Court of Appeals affirmed the dismissal of a chapter 11 case based in part on the finding that it was filed in bad faith. In affirming the finding of bad faith on the part of the debtor, the *C–TC 9th Avenue Partnership* court listed eight factors which it considered to be indicative of a bad faith filing:

(1) the debtor has only one asset;

(2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6) the debtor has little or no cash flow;

(7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8) the debtor has no employees.

*Id.* at 1311. The court found that the presence of these factors was sufficient to show that the debtor had an impermissible purpose in filing its chapter 11 petition.

It is clear that the first three *C–TC 9th Avenue Partnership* factors are present in the debtor's case. The Manhasset Center is the debtor's only asset, the claims of unsecured or subordinate creditors (approximately $6 million) are dwarfed by MetLife's claim (approximately $25–26 million) and the debtor was in the midst of a foreclosure action in state court when the petition was filed. Regarding the fourth factor, the debtor's dispute can be resolved adequately in the state court foreclosure action as no evidence has been presented that such dispute involves anything outside of a typical foreclosure. *Cf. In re 9281 Shore Road Owners Corp.,* 187 B.R. at 855 (finding dismissal of chapter 11 case unjustified as debtor's claims for fraudulent conveyances and equitable subordination could not be pursued in state court foreclosure action). The fifth *C–TC 9th Avenue Partnership* factor also mandates dismissal where, as previously discussed, the debtor's petition was filed largely in response to the foreclosure action and the appointment of a receiver. The sixth and seventh factors also support a finding of bad faith where clearly the debtor is unable to meet its current debt service, including the payment of taxes. Indeed, the debtor has admitted that this was a motivation for the filing of the petition. *See* Zausner Aff., at 5. So although the debtor has cash flow, it is insufficient given its liabilities. Finally, factor eight is unpersuasive. Although the debtor does have five employees, this is factor alone can not dominate the strength of the other seven factors.

The decision in *C–TC 9th Avenue Partnership* has been described as furthering "the court of appeals view that in single asset real estate cases, debtors cannot manipulate the Bankruptcy Code to thwart the legitimate rights of secured creditors to realize on their claim." *In re Shea & Gould,* 214 B.R. 739, 744 (Bankr.S.D.N.Y.1997). I conclude that to allow this case to continue would contradict this policy. The debtor has argued that it did not file its petition in bad faith and that no such finding may be made based upon the *C–TC 9th Avenue Partnership* factors alone. However, as indicated by the previous discussion, the dismissal of Northtown II is not only predicated on the presence of these factors indicating bad faith, but also on the debtor's inability to confirm a plan of reorganization due to the proscription contained in § 1127(b) and the debtor's lack of a reasonable likelihood of reorganization. Therefore, MetLife's motion to dismiss the instant chapter 11 pursuant to § 1112 is granted.

### CONCLUSION

1. This court has jurisdiction over the instant matter pursuant to 28 U.S.C.A. §§ 157 & 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York, dated August 28, 1986. MetLife's motion to dismiss the debtor's chapter 11 case is a core matter within 28 U.S.C.A. § 157(b)(2)(A).

2. MetLife's motion to dismiss the debtor's chapter 11 case, pursuant to 11 U.S.C.A. § 1112(b), is granted.

3. MetLife is directed to settle an order in conformance with this memorandum.